845 So.2d 1199 (2003)
Yolanda BARBARIN
v.
TLC HOME HEALTH and Louisiana Workers' Compensation Corporation.
No. 02-CA-1054.
Court of Appeal of Louisiana, Fifth Circuit.
April 29, 2003.
*1201 Sammie M. Henry Johnson, Stiltner & Rahman, Baton Rouge, LA, for Appellant.
Diane R. Lundeen, New Orleans, LA, for Appellee.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA and SUSAN M. CHEHARDY.
JAMES L. CANNELLA, Judge.
The Defendants, TLC Home Health, Inc. (TLC) and the Louisiana Workers Compensation Corporation (LWCC), appeal from a judgment in this workers' compensation case. The Plaintiff, Yolanda Barbarin answered the appeal. We amend in part and affirm as amended.
On May 17, 1994, the Plaintiff was employed by TLC as a home health aide and was assisting a patient who lived with her *1202 mentally ill daughter. As the Plaintiff was leaving the house, the patient's daughter struck the Plaintiff on the head with a lead pipe. The Plaintiff, stunned and cut on the head, was taken to the emergency room, where she received 16 stitches to the cut and was released. Afterwards, she suffered headaches, dizziness and started to have fainting and/or psychogenic seizure episodes. She was treated by a family doctor until he referred her to a neurologist. From that date forward, she saw various neurologists, psychologists and psychiatrists. She was also paid workers' compensation benefits and medical expenses.
On December 14, 2000, the Plaintiff filed a Disputed Claim for Compensation after the Defendants terminated her indemnity benefits, refused payment of certain medical bills and refused to authorize a change to a physician of her choice following her doctor's withdrawal from her case. In the claim, the Plaintiff asked for approval to obtain a new treating neurologist of choice, for reinstatement of indemnity benefits, for payment of continued medical care with a cardiologist and a psychiatrist, and for payment of numerous emergency room visits and ambulance transportation bills. On September 6, 2001, LWCC agreed to pay supplemental earnings benefits based on minimum wage and to allow the Plaintiff to be evaluated by Dr. Leon Weisburg, a neurologist, her physician of choice.
The case was heard on April 1, 2002. The workers' compensation judge found the Plaintiff to be temporarily, totally disabled (TTD) from the accident and, pursuant to Dr. Weisberg's recommendation, ordered her to be placed in the care of Dr. Jeffrey Nicholl. The workers' compensation judge also found that the Defendants were arbitrary and capricious in denying the Plaintiff authorization for a new choice of physician and for untimely payment of indemnity benefits. The judge awarded the Plaintiff $2,000 for the Defendant's failure to approve the doctor, $2,000 for the untimely benefits payments, and attorney's fees of $15,000. He denied the claim for the numerous emergency and ambulance visits, and a claim for TED hose (specially designed compression stocking, sometimes used after surgery to reduce swelling and prevent blood clots, named after G. Kendall Ted), finding that the Plaintiff failed to prove that they were medically necessary.

DEFENDANTS' APPEAL
The Defendants assert that the workers' compensation judge erred in finding the Plaintiff TTD as a result of the accident and in assessing penalties and attorney's fees.
The appellate court's review of the workers' compensation judge's findings of fact is governed by the manifest error or clearly wrong standard and will not be disturbed absent such a finding. Campbell v. Gootee Const. Co., 99-913, p. 9 (La.App. 5th Cir.1/12/00), 756 So.2d 449, 453; Chaisson v. Cajun Bag & Supply Co., 97-1225, p. 13 (La.3/4/98), 708 So.2d 375, 380. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Chaisson, 97-1225 at p. 13, 708 So.2d at 380. Where there are two permissible views of the evidence, a factfinder's choice of them can never be manifestly erroneous or clearly wrong. Chaisson, at p. 14, 708 So.2d at 381. Thus, if the factfinder's findings are reasonable in light of the record, the court of appeal may not reverse or modify the judgment. Id.
La.R.S. 23:1221(1)(c) provides:

*1203 (c) For purposes of Subparagraph (1)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (1)(b) of this Paragraph, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment. (Emphasis added.)

Temporary Total Disability
The record reflects that, after the injury, the Plaintiff went to her family doctor, Dr. C.J. Meyers, who diagnosed her with post-traumatic stress syndrome and seizure disorder. From the beginning, according to the Plaintiff, she suffered from headaches, tremors, visual blurring, dizziness, fainting and/or seizures, panic attacks, and behavior changes which cause her to overreact to stressful events. When the symptoms did not stop, Dr. Meyers referred her to a neurologist, Dr. Thor E. Borreson, who was with the Culicchia Neurological Clinic at the time. Dr. Borreson started treating her in March of 1994 for post-traumatic headaches and dizziness. While under his care, the Plaintiff was referred to Dr. Robert Detrinis, a psychiatrist, who diagnosed post-traumatic stress disorder, Dr. Frank Parker, a clinical psychologist, who diagnosed her with a psychological disorder, and by Dr. Susan Boston and Dr. R. Joseph Tammie, who found that she had a concussion with psychiatric overlay.
In January of 1996, Dr. Walter Truax, who is also with the Culicchia Neurological Clinic, performed an electromyography (EMG) which was negative and Dr. Boston and Dr. Tammie reported that the Plaintiff could return to work. In February and November of 1996, Dr. Detrinis and Dr. Thomas Hannie, a clinical psychologist, indicated that her attitude was interfering with going back to work.
Sometime in 1996, Dr. Borreson left the country. Dr. Meyers referred the Plaintiff to Dr. Steven Atkins, another neurologist, who diagnosed her with post-concussion syndrome as a result of the accident that was causing seizures and panic attacks. He did not release her to return to work. Dr. Atkins prescribed anti-epileptic drugs. Either before or after she began treatment with Dr. Atkins, she also saw Dr. D.C. Mohnot, another neurologist, and Dr. Parker. Dr. Parker concluded at that time that the Plaintiff was disabled based on her symptoms of dizziness, nausea, tremors, and memory and concentration problems.
In August of 2000, Dr. Atkins withdrew from her treatment because the Plaintiff lost confidence in his drug treatment. She believed that the drugs were not helping her condition. The Plaintiff immediately notified the Defendants of Dr. Atkins decision and requested authorization to see a new physician of choice. In particular, the Plaintiff asked to see Dr. Leon Weisberg, a neurologist from Tulane University Medical Center. The LWCC delayed responding to this request, despite several requests from the Plaintiff. They eventually denied the request, apparently because she had already been to many doctors, even though she was legally entitled to a new treating neurologist of her choice.
*1204 In December of 2000, a pacemaker was implanted to control the fainting and seizure episodes which were caused by changes in the heart rhythm. While in the hospital, the Plaintiff was treated by Dr. Michael Puente and Dr. Samuel Ferris, a cardiologist. Following this hospitalization, she saw a mental health clinic doctor several times because the doctors indicated that her fainting was psychological. Dr. Susan Boston placed her in group therapy. The Plaintiff stopped after a few sessions because the sessions were not helpful.
During that same time period, although they had denied approval for the Plaintiff to seek a new physician of choice, the LWCC set up an appointment with its choice of neurologists, Dr. Walter Truax. He found no evidence of neurological disease or injury and concluded that the Plaintiff could work without restrictions despite the substantial evidence of her fainting and seizure spells. In November of 2000, because Dr. Truax's opinion conflicted with Dr. Atkins' diagnosis, the LWCC requested an independent medical opinion through the Office of Workers' Compensation. Dr. Donald Gervais, another neurologist, was appointed. After examining the Plaintiff, Dr. Gervais diagnosed the Plaintiff with psychomatic conversion disorder "as opposed to malingering." However, he found no significant deficit and commented on the possibility of malingering. He recommended that she return to work, but advised her to continue psychiatric therapy. Based on these two reports, the Defendants terminated indemnity benefits on February 22, 2001.
Pursuant to on-going demands by the Plaintiff, in September of 2001, LWCC agreed to authorize the Plaintiff to see Dr. Weisberg. Yet, the LWCC delayed the authorization again and had to be ruled into court to enforce the agreement. The LWCC finally issued the authorization in December of 2001. The Plaintiff saw Dr. Weisberg on December 21, 2001.
According to Dr. Weisburg, the head injury caused Plaintiff's problems and her symptoms are consistent with post-concussion syndrome. He testified that the Plaintiff suffers from neurocardiogenic syncope, which means fainting episodes and psychogenic (non-neurological) seizures, two separate conditions. His conclusion was supported by the medical records. Dr. Weisberg noted that 80% of patients recover from post-concussion syndrome within months of an injury, but the other 20% continue to suffer long past that time. Patients that do not recover within six months are difficult to rehabilitate because of the psychological factors causing the physical symptoms. In addition, Dr. Weisberg stated that the Plaintiff's ability to work is compromised by her sudden fainting/seizure spells because the sudden loss of consciousness creates a safety problem for her and others around her. Thus, he believed that the safety issue precludes the Plaintiff from obtaining or maintaining employment.
According to Dr. Weisberg, both the fainting episodes and psychogenic seizures are triggered by emotional stressors and are real events. Basically, these are conversion reactions in which an emotional stressor causes physical changes in the body. The neurocardiogenic syncope results from a involuntary change in the portion of the autonomic nervous system which controls emotions. As a result, the patient's heart rate and blood pressure drop and the patient loses consciousness. The patient also loses consciousness in a psychogenic seizure. The seizure, however, *1205 may be accompanied by side to side jerking movements. Dr. Weisberg explained that these are not "true" seizures because there are no concurrent changes in electrical activity in the brain. In addition, a psychogenic seizure differs from the "true" seizure in the movements that accompany the blackouts. The epileptic's movements are up and down, whereas the movements in a psychogenic seizure are side to side. However, he stated that a lay person would not know the difference. Since the psychogenic seizures are stress related, or emotionally induced, anti-epileptic medications do not work. This explains why Dr. Atkins' treatment with anti-epileptic drugs was unsuccessful.
Dr. Weisberg testified that sexual abuse, physical abuse, or pending litigation are three known stressors that cause psychogenic seizures. In this case, the applicable stressor is the pending workers' compensation litigation. Dr. Weisberg emphasized, however, that although the psychogenic seizures are often referred to as "pseudo" seizures, they are real, physical responses to an emotional factor and are frightening to the patient. Because of her sudden blackouts, he testified that the Plaintiff should not be going out in public alone or driving alone. The doctor stated that the Plaintiff should recover from this condition after this litigation is completed, thus, resolving her medical needs.
Dr. Weisberg testified that post-concussion syndrome can also cause behavior changes, including overreacting (blowing things out of proportion) and panic attacks, which result from the body's flight or fight mechanism when stressed. The Plaintiff has suffered from both of these behavior changes since the accident. Both changes can be attributed to the Plaintiff's frustration with the Defendants for denying medical treatment and with other medical personnel for not believing that her complaints are real. Dr. Weisberg noted that it is common for those involved in a patient's care to become suspicious of a patient's complaints when the condition is difficult to treat. Dr. Weisberg recommended that the Plaintiff continue treatment with Dr. Jeffrey Nicholl, the Director of the Epilepsy Monitoring Unit at Tulane University Medical Center, who is board certified in neurology, psychiatry, clinical neurophysiology, and emergency medicine.
After reviewing the evidence, we conclude that the trial judge did not err in finding the Plaintiff to be TTD. The Plaintiff was seen by various doctors from the date of the accident. Her symptoms consistently included headaches, panic attacks, tremors, and fainting or psychogenic seizures. She was diagnosed by almost every doctor with post-concussion syndrome and/or post traumatic stress syndrome. While some of the medical professionals indicated a possibility that the Plaintiff was malingering, as the tests given to determine the source of the complaints failed to disclose any organic abnormality, no one denied her treatment and the doctors continued to try to control the problems. Because she had the sudden fainting events and/or psychogenic seizures, a pacemaker was implanted to control the heart rhythms and loss of consciousness. This was partially successful, but the Plaintiff continues to have episodes of sudden loss of consciousness. This implant procedure would have been unnecessary if the doctors believed that she was not sincere. Given her current condition and the prognosis of possible recovery in the future, we find that the workers' compensation judge was not manifestly erroneous in finding the Plaintiff TTD.

*1206 Penalties and Attorney's Fees
La. R.S. 23:1201 F provides for the imposition of penalties and attorneys fees when indemnity or medical benefits due to the claimant are not paid timely. However, under R.S. 23:1201 F(2), this does not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control. In order to reasonably controvert a claim, the Defendant must have some valid reason or evidence upon which to base the denial of benefits. Brown v. Texas-La Cartage, Inc., 98-1063, p. 9 (La.12/1/98), 721 So.2d 885, 890. Thus, the court must determine whether the Defendant engaged in a non-frivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time which they refused to pay all or part of the benefits allegedly owed. Id. The assessment of penalties and attorney's fees by the worker's compensation judge is a factual question, which will not be disturbed on appeal in the absence of manifest error. Campbell, 99-913 at p. 9, 756 So.2d at 453.
The Defendants discontinued the Plaintiff's indemnity benefits prior to allowing her to obtain a new treating physician. Instead, they relied on reports that contradicted other equally reliable medical evidence and conclusions indicating that the Plaintiff was unable to work due to her frequent fainting/seizure episodes. Notably, Dr. Atkins, her treating physician for several years, did not release her to return to work. Furthermore, the LWCC terminated her benefits before authorizing payment for the Plaintiff's new choice of physician, even though she was entitled to it after Dr. Atkins withdrew from her case. From August of 2000 to December 21, 2001, the Plaintiff did not have a treating physician, yet they refused to approve authorization for the Plaintiff to see Dr. Weisberg timely without any justifiable reason, and forced her to wait over one year before providing the authorization. Notably, they even agreed to pay supplemental earnings benefits after she filed a claim. Furthermore, even Dr. Truax recognized that the Plaintiff was experiencing conversion reactions, a psychological problem, as opposed to malingering. Based on the record, we find that the LWCC did not have sufficient reason to terminate the Plaintiff's benefits before Dr. Weisberg had an opportunity to examine the Plaintiff. For these reasons, we find that the workers' compensation judge was not clearly wrong in awarding penalties and the amount of the penalties ($4,000).

THE PLAINTIFF'S APPEAL
The Plaintiff answered the appeal, asserting that the workers' compensation judge erred in denying medical expenses for in-patient stays at West Jefferson Hospital, for treatment with Dr. Friley at Westcare Medical, for past and future emergency room visits, for ambulance bills, and for TED hose. She contends that she is entitled to penalties and attorney's fees for the Defendants' refusal to pay for the TED hose and that the workers' compensation judge should have awarded higher attorney's fees and penalties. The Plaintiff asks this Court for additional attorney's fees related to the prosecution and defense of this appeal.

Psychiatric Hospitalizations
In January of 2000, the Plaintiff was hospitalized at West Jefferson General Hospital for depression and indications *1207 that she was a high suicide risk. The source of the depression was her inability to work and the significant life changes from her disability. She was diagnosed with post-concussion syndrome and told to follow up with a neurologist. In December she was again admitted to West Jefferson for the same reasons she expressed in the January admission and added that she was tired of the workers' compensation carrier denying her request for a new neurologist. She told the doctors that she wanted to get better. The Plaintiff was treated for post-traumatic stress syndrome, depression, anxiety, syncopal episodes and a seizure disorder. She was found to be gravely disabled due to the syncopal episodes. Both of these bills are related to the accident. Thus, the trial judge erred in failing to order the Defendant to pay for these expenses.

Ambulance and Emergency Room Expenses
The Plaintiff produced bills for ambulance and emergency room visits at East Jefferson General Hospital and Tulane Medical Center due to seizure episodes on April 6, 2000, March 23, 2000, a follow up visit with Dr. Michael Friley the next day, July 16, 2000, July 17, 2000 (two episodes), August 10, 2000, August 29, 2000 (two episodes), several episodes in September, and another visit with Dr. Friley related to the episodes in October of 2000. During these blackout episodes, the Plaintiff's condition was observed and noted by the witnesses who described it to the emergency medical services (EMS), or by the EMS personnel. There was doubt by some of the medical personnel that she was experiencing true seizures, but she was nevertheless diagnosed with seizure disorder and syncopal episodes. According to Dr. Weisberg, she did experience loss of consciousness, although she did not have true seizures. At least two emergency room doctors noted that the ambulance transportation was medically necessary. Every emergency doctor recommended that the Plaintiff follow up with her neurologist.
In regard to the various emergency room visits, Dr. Weisberg stated that after the first several times, her family should have known how to deal with the episodes without going to the emergency room. Dr. Weisberg testified that the Plaintiff should not be going out in public alone or driving alone because she does lose consciousness. However, he noted that if the Plaintiff had been out without a friend or family member when these episodes occurred, it would be expected that strangers would call 911. The Plaintiff would not have any control over those emergency room trips.
There is no evidence in this case that the Plaintiff or her family understood that she did not need to go to an emergency room every time she lost consciousness, unless she was injured in some other way. No one told her or her family not to call an ambulance during these episodes. Further, the sight of a person passing out and having spastic movements would naturally trigger a 911 response. Thus, we find that the bills for the emergency room visits, the ambulances and Dr. Friley are compensable. However, the Plaintiff is now on notice by Dr. Weisberg that, in the future, she should contact her treating doctor if she experiences a loss of consciousness. Therefore, we will order the Defendant to pay for those bills incurred through the date of trial. Any other such bills will be disallowed.[1]

*1208 Claim for TED Hose
Dr. Jeffrey Nicholl is one of the Plaintiff's treating physicians and is associated with Dr. Weisberg. He prescribed TED hose for the Plaintiff, asserting that "Ms. Barbarin has severe fainting spells and needs TED support hose to help prevent them and avoid significant injury." The Defendant failed to comply with the request. We find that the claim is compensable. Thus, we will order the Defendant to pay for the TED hose.

Additional Penalties
We have reviewed the record and find no basis for additional attorney's fees. The failure to pay the bills for the Plaintiff's psychiatric hospitalizations, emergency room visits, ambulance transportation and TED hose was not arbitrary and capricious under these facts. We further find the penalties and attorney's fees awarded by the trial judge not abusively low.
Accordingly, the workers' compensation judgment is amended to include payment for the two psychiatric hospitalizations, all emergency room visits and their related expenses incurred through date of trial, and the prescription for TED hose. The judgment is hereby affirmed in all other respects, including the finding of temporary, total disability, the medical expenses awarded, and the award for penalties and attorney's fees. Costs of appeal are to be paid by the Defendants.
AMENDED IN PART AND AFFIRMED AS AMENDED.
NOTES
[1] We note that this does not preclude an emergency room visit for other reasons that are related to her condition.